UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

SALOME FELLS-JAPPA,

          Plaintiff,

-against-

WOMEN IN NEED, INC., REGINA
WADKINS, *Individually*, and
ANTHONY SANCHEZ, *Individually*,

          Defendants.
------------------------------------------------------------X

14 CV.: 4558

COMPLAINT

PLAINTIFF DEMANDS
A TRIAL BY JURY



RECEIVED
JUN 24 2014
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff, SALOME FELLS-JAPPA, by her attorneys, PHILLIPS & ASSOCIATES ATTORNEYS AT LAW, PLLC, hereby complains of the Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to <u>Title VII of the Civil Rights Act of 1964</u>, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII") and the New York City Administrative Code, §8-107 *et. seq.* ("NYCHRL"), and seeks damages to redress the injuries Plaintiff has suffered as a result of being sexually harassed, discriminated against because of her gender, retaliated against, severely humiliated, mentally anguished, and emotionally and physically distressed by the Defendants.

## JURISDICTION AND VENUE

2. Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over the claims of plaintiff brought under city law pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this district based upon the fact that a substantial part of the events giving rise to the claim occurred within the County of New York, State of New York, within the Southern District of New York. 28 U.S.C. §1391(b).

## PROCEDURAL PREREQUISITES

4. Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunities Commission ("EEOC").

5. Plaintiff received a Notice of Right to Sue from the EEOC, dated _____2012, with respect to the herein charges of discrimination. A copy of the Notice is annexed hereto.

6. This Action is being commenced within 90 days of receipt of said Right to Sue.

## PARTIES

7. That at all times relevant hereto, Plaintiff SALOME FELLS-JAPPA ("JAPPA") is a resident of the State of New York and County of Kings.

8. That at all times relevant hereto, Defendant WOMEN IN NEED, INC., ("WOMEN IN NEED") was and is a domestic non-profit organization duly existing by virtue of the laws of the State of New York.

9. That at all times relevant hereto, Defendant WOMEN IN NEED owns and/or operates its headquarters located at 115 West 31st Street, New York, New York 10001.

10. That at all times relevant hereto, Plaintiff JAPPA was an employee of Defendant WOMEN IN NEED.

11. That at all times relevant hereto, Defendant REGINA WADKINS ("WADKINS") was and is a resident of the State of New York.

12. That at all times relevant hereto, Defendant WADKINS was and is an employee of Defendant WOMEN IN NEED, holding the position of "Senior Director."

13. That at all times relevant hereto, Defendant WADKINS was Plaintiff JAPPA's supervisor

and/or held supervisory authority over Plaintiff JAPPA.

14. Defendant WADKINS had the authority to directly or otherwise influence the hiring, firing and/or effect the terms and conditions of Plaintiff's employment.

15. That at all times relevant hereto, Defendant ANTHONY SANCHEZ ("SANCHEZ") was and is a resident of the State of New York.

16. That at all times relevant hereto, Defendant SANCHEZ was and is an employee of Defendant WOMEN IN NEED, holding the position of "Shift Supervisor."

17. That at all times relevant hereto, Defendant SANCHEZ was Plaintiff JAPPA's supervisor and/or held supervisory authority over Plaintiff JAPPA.

18. Defendant SANCHEZ had the authority to directly or otherwise influence the hiring, firing and/or effect the terms and conditions of Plaintiff's employment.

19. Defendant WOMEN IN NEED, Defendant WADKINS and Defendant SANCHEZ are collectively referred to herein as "Defendants."

## MATERIAL FACTS

20. On or about August 5, 2013, Plaintiff JOHNSON began working for Defendant WOMEN IN NEED as a "Residential Aide" Sunday through Thursday from 12:00am until 8:00am, earning approximately $12.96 per hour with an overtime rate of $19.66 per hour.

21. At all times relevant hereto, Plaintiff JAPPA was an exemplary employee.

22. Throughout her tenure with Defendant WOMEN IN NEED, Plaintiff JAPPA received compliments for her work performance and got along well with her co-workers.

23. However, this all changed in or about August 2013 when Defendant SANCHEZ began to belittle and disrespect Plaintiff JAPPA on a continuous and repetitive basis, solely due to Plaintiff's gender.

24. Throughout Plaintiff JAPPA's employment with Defendant WOMEN IN NEED, Plaintiff

JAPPA was consistently and continuously discriminated against by Defendant SANCHEZ solely due to her gender (female).

25. An example of such animus occurred on or about August 18, 2013, when Defendant SANCHEZ began calling Plaintiff JAPPA derogatory names, such as "baby" and "honey." Defendant SANCHEZ also became physical with Plaintiff JAPPA, getting uncomfortably close to Plaintiff and touching Plaintiff's arms.

26. Plaintiff JAPPA made it clear to Defendant SANCHEZ that these comments were offensive and unwelcome.

27. Plaintiff stated to Defendant SANCHEZ that he is to call her by name, Mrs. Jappa. In addition, she advised him to stop touching Plaintiff because it made her uncomfortable. Defendant SANCHEZ responded by asking Plaintiff why she was "getting so defensive."

28. Following this incident, Plaintiff was upset and attempted to call her co-worker, Ms. Ambra Martin, to inform her of what had happened. However, was not able to reach her.

29. On or about August 19, 2013, Plaintiff spoke to Ms. Martin. Plaintiff JAPPA described to Ms. Martin the offensive names Defendant SANCHEZ called Plaintiff and his inappropriate touching.

30. To Plaintiff's dismay, Ms. Martin responded by telling Plaintiff to "calm down" because Plaintiff "didn't want to lose her job," implying that Defendants would retaliate against Plaintiff by terminating her employment if Plaintiff complained about Defendant SANCHEZ's behavior.

31. Then, on August 20, 2013, Defendant SANCHEZ started making sexual advances toward Plaintiff JAPPA again, telling Plaintiff she "looked good in her regular clothes." Defendant SANCHEZ sat with his legs spread open and his hand on his groin while speaking to Plaintiff JAPPA.

32. Soon thereafter, Plaintiff JAPPA and some of her co-workers were discussing the shift supervisors when Plaintiff mentioned Defendant SANCHEZ's lewd behavior. Ms. Kniya Rashad responded, "Y'all didn't know that Mr. Sanchez is a pervert?" Ms. Fatima Wilson responded that she knew, Ms. Chaziti Jackson said, "That's Mr. Sanchez for you," and Ms. Ruth Russell was completely silent.

33. Ms. Rashad further went on to explain that Defendant SANCHEZ "looks at every girl [in the shelter] with a body on her," "always talks about sex," and "has sexual relations" with the women that live in the shelter.

34. When Plaintiff JAPPA told her co-workers about the unwelcome advances Defendant SANCHEZ had made toward Plaintiff, her co-workers merely replied that they were not surprised because he "makes sexual advances to all of the females that he comes in contact with."

35. Ms. Rashad implied that Defendant SANCHEZ's behavior should be tolerated, stating that Defendant was the "coolest out of the supervisors" and let his employees "do what they wanted."

36. Following this discussion, Plaintiff JAPPA called Ms. Martin and informed her that Plaintiff was not the only employee that Defendant SANCHEZ was harassing. Ms. Martin admitted that Defendant SANCHEZ had made sexual advances toward her as well, but that Ms. Martin had not complained because she did not want to lose her job.

37. Then, on or about August 25, 2013, Plaintiff JAPPA was conducting her rounds throughout the shelter when she stated that her legs were tired. Defendant SANCHEZ startled Plaintiff by appearing out of nowhere and saying, "I can help you with that."

38. Plaintiff took Defendant SANCHEZ"s statement to be a sexual innuendo.

39. Defendant SANCHEZ also continued to ask Plaintiff JAPPA about her relationship status

5

and asking, "How can your man deal with you? You're feisty…I like a feisty woman."

40. Plaintiff JAPPA tried to avoid these conversations with Defendant SANCHEZ, telling Defendant that Plaintiff did not want to disrespect Defendant, but Plaintiff's relationship status was none of Defendant's business.

41. Due to the ongoing, continuous harassment and the hostility that Plaintiff JAPPA was subjected to on a daily basis, Plaintiff could barely stand to go to work. Plaintiff JAPPA drafted a letter containing the instances of harassment by Defendant SANCHEZ that had occurred up until that point.

42. Plaintiff felt pressured to keep quiet so that she would not lose her job, Plaintiff kept the letter to herself.

43. Subsequently, on or about September 3, 2013, Defendant SANCHEZ was conducting roll call when Defendant told Plaintiff JAPPA she had something on her pants.

44. Ms. Wilson then informed Plaintiff that the reason Defendant SANCHEZ had told Plaintiff there was something on Plaintiff's pants was because Defendant saw Ms. Wilson catch Defendant staring at Plaintiff's buttocks. Defendant SANCHEZ's stares were offensive and unwelcome by Plaintiff JAPPA.

45. Then, on or about September 8, 2013, an ambulance was called for one of the residents of the shelter. Defendant SANCHEZ turned to Plaintiff JAPPA and said, "Let me take you to the hospital, Mrs. Jappa, and operate on you." Defendant SANCHEZ then started laughing and Plaintiff JAPPA became very upset, telling Defendant "it wasn't funny" and that Plaintiff "was sick of it." Plaintiff understood Defendant SANCHEZ's comment to be a sexual innuendo.

46. Plaintiff JAPPA told Defendant, "I'm taking this to the top," implying that she would report to Defendant SANCHEZ's misconduct to his superiors.

47. Subsequently, on or about September 10, 2013, Defendant SANCHEZ was in his office with a resident of the shelter when Plaintiff JAPPA walked by and saw that Defendant was sitting with his legs spread open toward the client.

48. Upon seeing Plaintiff outside his office, Defendant SANCHEZ stepped outside the door. Plaintiff JAPPA informed Defendant that the way he was sitting "didn't look right."

49. Defendant SANCHEZ then responded by telling Plaintiff JAPPA that he was the supervisor and that Plaintiff was "overstepping her boundaries." Plaintiff JAPPA, wanting Defendant to know that he could not do whatever he pleased with whomever he pleased, replied, "No, it looks like you're overstepping your boundaries and the client can accuse you of any wrongdoing."

50. Following that incident, Defendant SANCHEZ informed Plaintiff and her co-workers that one of the staff members was under investigation. The employees all looked at each other and agreed it was probably Defendant SANCHEZ.

51. On or about September 18, 2013, Ms. Kara Gonzales, one of the residents, told Plaintiff that Defendant SANCHEZ "was a pervert." Ms. Gonzales then went on to describe how Defendant SANCHEZ "came onto" Ms. Gonzales, shutting the door behind her in his office and telling her she had a "nice body."

52. Plaintiff JAPPA then told Ms. Gonzales to write the incident down. The Shift Supervisor, Ms. Vanessa Jeter, was nearby during the entire discussion. Before leaving at the end of Plaintiff's shift, Plaintiff confirmed that Ms. Jeter heard the conversation.

53. Later that night, Plaintiff received a message on her phone stating that Plaintiff needed to see Ms. Dora Mendez from Training and Development when Plaintiff's next shift was over.

54. The following morning, on or about September 19, 2013, Plaintiff JAPPA asked Ms.

Rashad who the supervisor for the next shift was because Plaintiff had to leave to go to see Ms. Mendez at the main office.

55. Ms. Rashad then replied, "I told you not to write that letter," referring to the letter about Defendant SANCHEZ's misbehavior.

56. Ms. Rashad stated no one wanted Ms. Johnson to be their supervisor, so everyone would rather cope with Defendant SANCHEZ's sexual harassment and any other wrongdoing than to "deal with Ms. Johnson."

57. On Plaintiff's way to Ms. Mendez's office, Plaintiff ran into Ms. Gonzales. Plaintiff JAPPA informed Ms. Gonzales that she was going to the main office to inform Defendants about what Ms. Gonzales had told Plaintiff the day before. Ms. Gonzales confirmed, stating, "I don't care, I hate him anyway."

58. Plaintiff JAPPA also called Ms. Martin to inform her that Plaintiff was going to the main office. Ms. Martin urged Plaintiff not to tell Defendants that Ms. Martin had told Plaintiff that Defendant SANCHEZ had made unwanted sexual advances toward Ms. Martin as well.

59. Plaintiff JAPPA then insisted that Ms. Martin tell Defendants herself. However, Ms. Martin again replied that she would not complain because she did not want to lose her job.

60. When Plaintiff JAPPA finally arrived at the main office, Defendant WADKINS brought Plaintiff into a meeting with Defendant WADKINS and Ms. Mendez. After being seated across the table from them, they asked Plaintiff JAPPA if Plaintiff knew of any Residential Aides and Supervisors involved in any personal relationships in the office.

61. Plaintiff JAPPA hesitantly replied, "Residential Aide," twice. Ms. Mendez then asked Plaintiff why she kept saying, "Residential Aide." Plaintiff responded that it was because

8

she was thinking, and then ultimately responded to their question, "No."

62. Ms. Mendez asked Plaintiff if she was "sure." Plaintiff, scared of losing her job, but wanting to report Defendant SANCHEZ's behavior, finally responded that that the only incident Plaintiff knew of was that Defendant SANCHEZ had been sexually harassing Plaintiff.

63. Defendant WADKINS replied that she had not heard about any harassment between Defendant SANCHEZ and Plaintiff, and then asked if Plaintiff had told anyone.

64. Plaintiff hesitated, then replied, "No," because she feared she would lose her job and/or jeopardize her co-workers' jobs.

65. Plaintiff then added that she wrote a letter describing the incidents and would have brought it if Plaintiff had known Defendants were calling her to the main office to discuss sexual harassment.

66. Plaintiff JAPPA then began to tell Defendant WADKINS about the conversation Plaintiff had had with Ms. Rashad regarding how Plaintiff's co-workers would rather deal with Defendant SANCHEZ's harassment than have Ms. Johnson as their supervisor.

67. Defendant WADKINS replied that she knew Plaintiff was telling the truth because Plaintiff had never met Ms. Johnson.

68. Despite being told that Defendant believed her, Plaintiff JAPPA repeatedly asked Defendant WADKINS if Plaintiff would lose her job. Defendant WADKINS assured Plaintiff that Plaintiff was "doing the right thing" by reporting what had taken place. Defendant WADKINS also added that Defendants would investigate the allegations and asked that Plaintiff bring her letter to Defendants on September 25, 2013, when Plaintiff was scheduled for training.

69. On or about September 23, 2013, Defendant SANCHEZ was not at work. That morning,

Plaintiff JAPPA showed Ms. Wilson and Ms. Jeter, the Shift Supervisor, Plaintiff's letter to Defendant WADKINS explaining in detail the harassment Plaintiff had been subjected to by Defendant SANCHEZ. Ms. Wilson and Ms. Jeter both averred that the letter was true and accurate.

70. Then, on or about September 25, 2013, when Plaintiff JAPPA arrived at Defendants' main office for training, Plaintiff handed the letter to Defendant WADKINS. However, Defendant WADKINS instructed Plaintiff to give the letter to Ms. Mendez because Defendant WADKINS was leaving.

71. Upon handing Ms. Mendez the letter, Ms. Mendez asked Plaintiff JAPPA if Plaintiff had let anyone know "what's going on." Plaintiff replied, "Everyone knows what's going on."

72. On or about October 10, 2013, just two weeks after making a complaint of sexual harassment, Defendants called Plaintiff JAPPA to their main office. When Plaintiff arrived, Defendant WADKINS called Plaintiff into her office, where she was accompanied by Mr. Roudy Vincent, Corporate Director of Security.

73. Defendant WADKINS then proceeded to tell Plaintiff that Defendant WOMEN IN NEED was exercising its rights to terminate Plaintiff's employment, effective immediately.

74. Plaintiff then asked Defendant WADKINS why her employment was being terminated because Plaintiff "hadn't done anything [wrong]."

75. Defendant WADKINS merely replied that Plaintiff's employment was at-will. Mr. Vincent proceeded to add that "it's like when employees leave and resign."

76. Clearly, this is not an instance "like when employees leave and resign." Plaintiff JAPPA was terminated solely in retaliation of her complaints of sexual harassment and gender

discrimination.

77. Plaintiff JAPPA felt and continues to feel offended, disturbed, and humiliated by Defendant SANCHEZ's above discriminatory and retaliatory comments and conduct.

78. Defendants created a hostile working environment for Plaintiff JAPPA as a result of the forgoing.

79. The above are just some of the acts of harassment and discrimination that Plaintiff JAPPA experienced on a regular and continual basis while employed by Defendant WOMEN IN NEED.

80. Plaintiff JAPPA was treated differently (harassed and discriminated against) by Defendants solely because she is a female.

81. Plaintiff JAPPA was regularly exposed to differential treatment and a hostile work environment because of her gender by Defendant SANCHEZ, who was her superior.

82. Plaintiff has been unlawfully discriminated against, was humiliated, was harassed, has been degraded and belittled; and as a result suffers loss of rights, emotional distress, loss of income, earnings and physical injury.

83. Defendants' actions and conduct were intentional and intended to harm the Plaintiff.

84. Plaintiff's performance was, upon information and belief, above average during the course of employment with the Defendants.

85. As a result of Defendants' actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, severely emotional distressed, and suffered physical ailments.

86. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

Plaintiff has further experienced severe emotional and physical distress.

87. As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdiction limits of the Court.

88. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, the Plaintiff demands Punitive Damages as against both Defendants, jointly and severally.

### AS A FIRST CAUSE OF ACTION
### FOR DISCRIMINATION UNDER TITLE VII
### (Not Against Individual Defendant)

89. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

90. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiff complains of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's gender (sexual harassment).

91. Defendants violated the above section by discriminating against Plaintiff, solely due to her gender and by retaliating against her for complaints of discrimination.

### AS A SECOND CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

92. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

93. The Administrative Code of City of NY § 8-107 [1] provides that:

It shall be an unlawful discriminatory practice: (a) For an employer or an

employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

94. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of her gender.

### AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

95. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

96. The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

97. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

### AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

98. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

99. Plaintiff repeats and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

100. The New York City Administrative Code Title 8, §8-107 (7) provides that:

It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter…

101. Defendants engaged in an unlawful and retaliatory discriminatory practice by retaliating, and otherwise discriminating against the Plaintiff, including, but not limited to, terminating Plaintiff's employment because she opposed Defendants' unlawful employment actions.

### AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

102. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

103. New York City Administrative Code Title 8-107(13) Employer liability for discriminatory conduct by employee, agent or independent contractor.

    a. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

    b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

    1. the employee or agent exercised managerial or supervisory responsibility; or

    2. the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known

           by another employee or agent who exercised managerial or supervisory responsibility; or

       3. the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

   c. An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

104. Defendants violated the section cited herein as set forth.

## **INJURY AND DAMAGES**

105. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of a career and the loss of a salary, bonuses, benefits and other compensation which such employment entails, out-of-pocket medical expenses and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, injury to her reputation, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendants engaged in unlawful employment practice prohibited by Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et. seq. and the New York City Administrative Code, §8-107 et seq., that the Defendants discriminated against and harassed the Plaintiff on the basis of her gender;

B. Awarding damages to the Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and to otherwise make her whole for any losses suffered as a result of such unlawful employment practice;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of the action;

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

Dated: New York, New York
       December 10, 2013

PHILLIPS & PHILLIPS
ATTORNEYS AT LAW, PLLC

_____
Marjorie Mesidor (MM1978)
45 Broadway, Suite 620
New York, NY 10006
(212) 248-7431
MSharpe@tpglaws.com